IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROCHELLE HAMBRICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 1:21-cv-00030 |
| | ) | |
| ANDREW SAUL, as Commissioner of the | ) | Judge Thomas M. Durkin |
| United States Social Security Commission | ) | |
| | ) | Magistrate Judge Heather K. McShain |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

NOW COMES the Plaintiff, ROCHELLE HAMBRICK, by and through her attorney, Arthur R. Ehrlich of the Law Offices of GOLDMAN & EHRLICH, CHTD., and as her response to Defendant's Motion for Summary Judgment, states as follows:

**FACTS**

Margie Sletten, Deputy Assistant Regional Commissioner for Processing Operations, reassigned Plaintiff in January of 2016 from Debt Management to PITAG. Plaintiff Rule 56 Statement (PSF) ¶ 2. Plaintiff was transferred despite being told during her October 2015 performance meeting that she was doing a great job as manager and received the Regional Commissioner's award twice as the manager of that unit. PSF ¶ 1. Sletten said the transfer was due not completing the training of her staff and failing to correctly answer some unknown question. PSF ¶¶ 3-4. Sletten did not give any details about this incorrect information and Plaintiff completed the training of her staff by the Spring of 2015. ¶¶ 3-4. Moreover, Plaintiff had to singlehandedly train her staff as manager of PITAG because there were many new employees assigned to that unit. PSF ¶ 3. Plaintiff's name was omitted from the managers' directory when she was reassigned and she

was directed by Antonio Henderson, Deputy OSB Chief, to move from an office to a cubicle. No other GS 13 manager was required to work out of a cubicle. PSF ¶ 5.

Although her managers claimed she was moved out of Debt Management due to alleged performance issues, PITAG was an important highly specialized unit that also supported other units. PSF ¶ 6. PITAG was severely understaffed, lacked needed technical staff, had no assistant manager as other units had, and had a backlog of 12,000 cases. PSF ¶¶ 6-7. This was a "drowning unit" and Plaintiff's managers were fully aware of this when they insisted that she expeditiously complete assignments, gave her duties such as supervising and training a virtual windfall offset team, and had her spend an inordinate amount of time compiling a spread sheet for aged cases in the modules and then disregarding the report she spent so much time preparing. PSF ¶¶ 7-9, 17.

Bernard Mull, who was a peer as manager of another module, began bombarding Plaintiff with email requests asking when she was going to complete some of her cases. PSF ¶ 11. Mull's subordinate managers then began sending emails directly to Plaintiff's employees, bypassing Plaintiff, insisting that their cases be completed by Plaintiff's employees. PSF ¶¶ 12-13. Plaintiff and Angelo Petros, Operations Support Branch Chief, both told Mull and Mull's subordinates to send these emails to Plaintiff only, but Mull's staff continued to send emails to Plaintiff's employees. ¶¶ 12-13. Moreover, Mull was well aware that Plaintiff's unit was shorthanded, was working through a large preexisting backlog of cases and on other high priority cases, and that Plaintiff's team was still waiting on Mull's unit to complete their part on cases before Plaintiff could complete her work on those cases. PSF ¶¶ 11, 14. Mull did not do this to other managers. PSF ¶ 11.

Mull chose to escalate this matter to upper management rather than simply discuss the issue directly with Plaintiff, and Mull's complaints were then cited as an issue in Plaintiff's performance ratings, and the direct contacts to her staff undermined her authority and interfered with her

employee's work. PSF ¶¶ 11-12, 14. Plaintiff was criticized for sending emails to her peers in the past rather than speaking to them directly, yet Mull was allowed to repeatedly send these emails to Plaintiff copying other managers. PSF ¶15. Petros and Antonio Henderson who supervised Plaintiff, directed her to tell Mull when she could complete these cases though they knew Plaintiff was short on staff, inherited a large backlog of cases, had to wait for other units to complete their portion of work for these cases, and that she was working on other high priority cases within her unit, all of which made it impossible for Plaintiff to provide Mull with a realistic completion date. PSF ¶ 16.

In September of 2019, Defendant kept insisting that Plaintiff failed to provide accurate information to a Congressional aide, and was rude to the aide. In fact, an employee assigned to review the matter confirmed that the information Plaintiff provided was complete and accurate. PSF ¶ 18. Rather than being rude, Plaintiff merely explained in detail to the Aide how and why the information provided was accurate. PSF ¶ 18. Moreover, the Aide complimented Plaintiff and Rick Lenoir confirmed that the Aide had nothing but good things to say about Plaintiff. PSF ¶ 19.

Despite being severely shorthanded with only 12 employees in 2016, compared to the 40 employees that modules had, Plaintiff still reduced her inherited backlog from 12,000 cases to 871, trained her new team members, successfully supervised and trained the virtual windfall offset team and created a detail of individuals to train others for this project, and voluntarily participated in a work shop helping other managers. PSF ¶¶ 6, 9, 10, 20. Plaintiff still received the worst performance rating in her career and was even accused of "coasting" despite the major accomplishments she achieved with a very limited staff. PSF ¶¶ 20-21. She was blamed for having some aged cases though she could not finish those cases until other units completed their portion of the work. PSF ¶ 22. When Plaintiff tried to explain that the failure of the other modules to complete their part of the work was affecting her ability to close out those cases, Petros faulted Plaintiff for

her inability to accept constructive criticism. PSF ¶ 22. Kristina Edwards, under the age of 40 and Caucasian, received a higher evaluation than Plaintiff despite having over 12,000 pending cases and more operational support and assistant managers than Plaintiff. PSF ¶ 23.

After Plaintiff filed another EEO charge on December 4, 2019, Defendant continued to discriminate and retaliate. Matthew Smith and Angelo Petros suddenly dumped 1841 older cases from other modules on her in January and added more in February which increased her previous case load of 871 to approximately 3000 as of February 2020. PSF ¶¶ 24-25. Smith admitted this was an unusually large amount of cases to assign to a unit at one time. PSF ¶ 25. On January 29, 2020, one month after her December 2019 EEO charge, Petros issued Plaintiff an Optional Job Discussion for being late to a meeting though he knew she was in the middle of a call with a Congressional aide. PSF ¶ 26. This was the first discussion she received in nearly 31 years, and younger Caucasian managers who were often late to meetings did not receive an Optional job discussion. PSF ¶¶ 26-27.

In February of 2020, 2 months after her December EEO charge was filed, Lenoir asked if her EEO was still pending, and then directed Plaintiff to meet weekly with Petros and Smith. PSF ¶ 28. Though Plaintiff's unit was performing well, these weekly meetings with Petros and Smith were entirely negative and accusatory. PSF ¶ 28. When Plaintiff requested emergency leave from Smith in February of 2020 when her daughter was in a car accident, Smith asked for documentation, asked her to work overtime, and failed to formally approve her request. PSF ¶ 29.

Plaintiff applied for several promotions, developmental or LEAD opportunities, and Details beginning in 2017 but was never selected despite her qualifications. PSF ¶ 30. She had over 30 years with Defendant, was working on a Masters degree, was in management for 12 years where she successfully managed and trained her staff, has years of experience in all of the relevant technical positions necessary for her to be a successful manager such as benefits authorizer and claims

representative, and has received important awards such as a Regional Commissioner Citation and a Commissioner Citation in recognition of her accomplishments. PSF ¶ 31. Younger Caucasian or non black employees were repeatedly promoted or selected over her for these assignments, though she had more extensive and broader relevant experience. PSF ¶¶ 30-38.

Younger Caucasian individuals benefitted from being repeatedly selected over Plaintiff for Details and LEAD opportunities, and Defendant fast tracked their promotions after giving them preferential developmental assignments which were not given to Plaintiff. PSF ¶¶ 30-38. Rick Lenoir selected John Bajorek, Caucasian under the age of 40, for several LEAD positions over Plaintiff, and promoted him three times in 3 years though Plaintiff was more qualified as she had more diverse experience in different positions, and more years with the Defendant. PSF ¶¶ 33-34. Bajorek is now a GS 14 after just 15 years with the Defendant, while Defendant waited 20 years before finally promoting Plaintiff to a GS 13 manager position. PSF ¶¶ 30, 33-34.

Matthew Smith, Caucasian and younger than Plaintiff, received several promotions, becoming a GS 13 Module Manager in January 2018 and a GS 14 manager in October of 2018, though he began with Defendant in 2011. PSF ¶ 36. Elisha Hatchett, who is younger than Plaintiff and Caucasian, was assigned as the module manager of Debt Management when Defendant forced Plaintiff to PITAG, and then received a developmental assignment as an operations manager GS 14 which Plaintiff applied for but did not get. PSF ¶ 37. Jana McCann, under 40 and Caucasian, "skyrocketed really quick" to a GS 13 despite only working for Defendant for a few years, and was then given special tasks for her development though Plaintiff had significantly more experience but was denied these opportunities. PSF ¶ 38.

Defendant told Plaintiff she did not get these same opportunities because she needed more

collaborative skills, despite her wealth of experience and having excelled as a manager precisely because of her leadership and collaborative skills. PSF ¶¶ 3, 9, 10, 35. She received the highest rating in the performance categories of "Achieves Business results," "Leadership." and "Manages Performance," cleared a backlog of 12,000 cases despite being severely understaffed, yet her managers, Matthew Smith and Petros, only recommended her for these positions "with reservations." PSF ¶¶ 31-32, 35; Ex. I.

Defendant and Margie Sletten also discriminated against older black managers such as Yvonne Hampton, Steve Harms, Sherman Johnson, C Nachtrag Trinchitella, Allen Tebbens, Rosie Carter, and David Turner. PSF ¶ 39. They were first asked to train younger Caucasian individuals, and then replaced by those individuals. PSF ¶¶ 39-40. These younger non black individuals included Isaac Aguilar who was hired in 2013 as a GS 7 or 9 and is now a GS 13 modular manager; Richard Wharton who began in 2008, received a developmental assignment within eight years, and then promoted in October 2017 to a GS-13 Section Chief; and Kristina Edwards who was promoted to a GS-13 Module Manager less than 10 years after being hired. PSF ¶ 40.

On January 22nd, Plaintiff's EEO appeal to the Office of Federal Operations was denied, and a few weeks later, in February 2021, Bernard Mull was assigned to be Operations Support Branch Chief making him Plaintiff's first line supervisor. PSF ¶ 41. Plaintiff requested a transfer so Mull would not be her supervisor due to her prior complaints against Mull. PSF ¶ 41. Sletten agreed to Plaintiff's request, but Rick Lenoir refused claiming that there was no reason why Plaintiff should not report to Mull. PSF ¶ 42.

## ARGUMENT

**Standard of Review on Summary Judgment**

The movant in summary judgment must prove that "there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law." *Babcock & Wilcox Co. v. Cormetech, Inc.*, 848 F.3d 754, 6th 761 (Cir. 2017). Summary judgment is "notoriously inappropriate" for deciding an action where issues of intent, good faith, or subjective feelings play an important role in determining the issues, because these issues are usually not capable of being resolved by summary judgment. *White Motor Co. v. U.S.*, 372 U.S. 253, 259 (1963). Since inquiries regarding Defendant's true motivation is often very fact intensive, this issue must typically be tried before a jury, and not at summary judgment. *White v. Baxter Healthcare Corp*., 533 F.3d 381, 401-02 (6th Cir. 2008); *Hunt v. Cromartie*, 526 U.S. 541, 549–50 (1999) ("[M]otivation is itself a factual question"). Thus, the summary judgment standard is applied with added rigor in employment discrimination cases, where intent and credibility are central issues. *See Webb v. Clyde L. Choate Mental Health & Dev. Ctr*., 230 F.3d 991, 997 (7th Cir. 2000).

Any relevant evidence must be considered as a whole on summary judgment regardless of whether it is labeled as direct or indirect because "evidence is evidence" and one form of evidence should not be treated differently from other evidence. *Ortiz v. Werner Enterprises Inc*., 834 F.3d 760, 765-66 (7th Cir. 2016). The court must construe all facts and draw all reasonable inferences in a light most favorable to the non-moving party. *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017). For example, Defendant's deviation from its standard procedures is circumstantial evidence of discrimination and creates an inference of pretext. *Baines*, 863 F.3d at 664. Selective enforcement of an alleged policy violation is also evidence of pretext. *Coleman v. Donahoe*, 667 F.3d 835, 858 (7th Cir. 2012).

In *Baines*, the court explained that since it "must accept" the testimony of a witness statement

relied on by Plaintiff as true on summary judgment, which contradicted a stated reason given by Defendant's decision maker, then this is evidence that Defendant lied. *Baines v. Walgreen Co.*, 863 F.3d 656, 665 (7th Cir. 2017). Evidence that the Defendant lied about the reasons for an adverse action therefore permits the fact finder to infer that Defendant's action were based on discrimination. *Id.*; *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) ("[I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation."); *O'Neal v. City of New Albany,* 293 F.3d 998, 1005 (7th Cir. 2002); *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511 (1993).

Evidence of pretext also doubles as evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90 at 99-100 (2003). The affidavit or deposition statement of an employee of the Defendant should not automatically be accepted on summary judgment because he is under the Defendant's power and is therefore not a disinterested witness. *Sapperstein v. Hager*, 188 F.3d 852, 856 (7th Cir. 1999).

In *Anderson v. Liberty Lobby, Inc.*, the Court explained that the standard for summary judgment "mirrors" the standard for a directed verdict. 477 U.S. 242, 250 (1986). Under FRCP 50(a) a directed verdict is only proper if "there can be but one reasonable conclusion as to the verdict," and must be denied if reasonable minds might differ when weighing the evidence. *Id.* at 250-52. In other words, the "inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*.

### I. PLAINTIFF DID EXHAUST HER ADMINISTRATIVE REMEDIES

Defendant argues that most of the discriminatory actions alleged in the complaint must be

ignored because Plaintiff did not initiate her EEO charges within 45 days of these acts. Her complaint, however, is not based on individual discrete acts of discrimination and retaliation. Rather, as Defendant notes on page 12 of its motion, Plaintiff has alleged that she was subjected to a hostile work environment from 2016 through 2020, which also includes some discrete acts such as promotions and developmental programs.

When alleging a hostile work environment or proceeding under a continuing violation theory, earlier acts outside the limitation period are not time barred when at least one act occurs within the relevant time period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *Bodden v. Dep't of Veterans Affairs*, EEOC Appeal No. 0120073734 (Feb. 21, 2008); *Kimzey v. Wal-Mart Stores, Inc.*, 107 F.3d 568, 572–73 (8th Cir. 1997); *Burns v. McGregor Elec. Indus., Inc.*, 955 F.2d 559, 563 (8th Cir.1992). In a hostile work environment claim, evidence concerning all circumstances of the complainant's employment must be considered, including the frequency of the offending conduct, its severity, whether it was humiliating, and whether it unreasonably interfered with work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22–24, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993); *Burns*, 955 F.2d at 563–64 (district court was required to consider harassing conduct occurring during all periods of employment). This is consistent with the requirement that the various alleged incidents must be considered cumulatively. *See Vergara v. Bentsen*, 868 F.Supp. 581 (S.D.N.Y. 1994); *King v. Hillen*, 21 F.3d 1572, 1581 (Fed. Cir. 1994) *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993).

Plaintiff's transfer to PITAG and acts occurring soon after this transfer, such as being moved to a cubicle, were not discrete acts. Plaintiff explained that she did not file her EEO charge until September because that was when she recognized that these incidents were based on discrimination.

Pltf Res to DSF, ¶ 25 (Ex. A, Pltf Dep., p. 181:1-19). The continuing violation theory applies when it would have been unreasonable for the Plaintiff to have filed earlier or where it is difficult to determine when the discrimination may have begun. *See Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 707–08 (7th Cir. 2002). Given Defendant's arguments that many of the acts of discrimination against Plaintiff do not constitute adverse action, it is unlikely Defendant is contending that the earlier acts, such as the transfer to PITAG, moving her to a cubicle, or Mull having his subordinates contact Plaintiff's employees directly, were adverse actions and therefore would not be discrete acts that would even allow for a successful EEO charge prior to September 2016. In *Morgan*, the Court identified terminations or promotions as examples of discrete acts that required a timely filing before the EEOC. 536 U.S. at 114. Therefore, the acts that Defendant contends are outside the 45 day limitation period are properly included in her complaint as part of the harassment that continued through September and after.

It should also be noted that even if those acts were deemed untimely, they are still admissible as background evidence and relevant to the determination of whether acts occurring within the filing period were discriminatory. *Morgan*, 536 U.S. 113-14; *Lyons v. England*, 307 F.3d 1092, 1110-12 (9th Cir. 2002).

Defendant also argues that Plaintiff cannot raise her non selections in 2018 and 2019 because these were not part of her EEO charges. This is not correct. Plaintiff noted in her 2016 EEO charge and EEO affidavit that there was a trend of promoting younger and Caucasian employees over older employees, and the EEOC Administrative Judge allowed Plaintiff to include her non selection claims, which were then investigated during Plaintiff's deposition during her 2016 EEO matter. DSF ¶ 64; DSF App., Ex. 28; DSF App. Ex. 5, Pltf EEO Aff. (¶ 46; SSA 222); DSF App. Ex. 1, Pltf EEO

10

Dep., pp. 153:10-154:24, 155:16-23; DSF App., Ex. 15, 2016 EEO affidavit, SSA 45. She also raised her non selections in her 2019 EEO charge. DSF App. Ex. 26, 2020 EEO charge, SSA 482.

Defendant also insists that the failure to promote in 2021 cannot be considered as it does not meet the exception requirements noted in *McKenzie v. Illinois Dept of Transportation*, though it does not explain why Plaintiff's 2021 promotion denials do not meet that exception. 92 F 3d 473, 483 (7th Cir 1996). This is probably because the procedural facts in the case at bar are entirely different from those in *McKenzie*. In *McKenzie*, the retaliatory acts in question occurred before the Plaintiff filed her EEOC charge. *Id.* In the case at bar, the denial of Plaintiff's 2021 promotions, and the non selections occurring after she filed her 2020 EEO charge, occurred *after* she filed that charge. *McKenzie*, as well as many other cases, make clear that there is no need to file a new or separate administrative charge for retaliation occurring after the first charge as this would just create an unnecessary and additional procedural safeguard. *Id.* at 482-83.

## II.
### PLAINTIFF SUFFERED AN ADVERSE ACTION AND HOSTILE WORK ENVIRONMENT BASED ON DISCRIMINATION AND RETALIATION

Defendant insists that Plaintiff did not suffer an adverse action, but its arguments on this point are flawed. Defendant first tries to strip the acts occurring before August of 2016 from this claim, but as argued above, the earlier actions are part of the hostile work environment claim. Defendant then analyzes what it believes to be the remaining acts, and concludes that none of these constitute adverse actions when considered individually. While Defendant concedes that the acts must be viewed cumulatively, its conclusion that there was not an adverse action is based on a separate review of each act. When viewed cumulatively as required, a hostile work environment and adverse action based on discrimination and retaliation are clear. *King v. Hillen*, 21 F.3d 1572, 1581

(Fed. Cir. 1994); *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993).

Margie Sletten transferred Plaintiff from Debt Management though she received awards for her performance, and reassigned to PITAG which was severely shorthanded, lacking technical staff and an assistant manager, and still expected to deal with the backlog of 12,000 cases she inherited. PSF ¶¶ 1-4. PITAG was a "drowning unit," which Plaintiff's managers were fully aware of, but she was still required to expeditiously complete assignments and criticized if she did not complete cases fast enough. PSF ¶¶ 6-9. Her managers further exacerbated her situation by moving her out of her office to a cubicle, and assigning time consuming tasks such as creating a spreadsheet for aged cases but never bothering to make use of this. PSF ¶¶ 5. 7-9, 17. Plaintiff was wrongly accused of failing to provide accurate information to a Congressional aide and being rude to that aide. Yet, Defendant knew from an employee assigned to review this matter, that Plaintiff provided accurate information, gave the aide a detailed explanation about the information provided, and that the aide had complimented Plaintiff. PSF ¶¶ 18-19.

Her managers allowed one of her peers, Bernard Mull, to bombard Plaintiff with emails asking when she would complete some cases despite being aware of how shorthanded she was, while failing to complete cases Plaintiff needed Mull to finish before she could complete her work. PSF ¶ 11. Mull's subordinates then sent emails directly to Plaintiff's employees thereby undermining her authority, and interfered with her employees' work, and let his subordinates persist with this tactic despite directives from Plaintiff to only contact her. PSF ¶¶ 12-14. Mull knew that Plaintiff's unit was shorthanded, was working through a large preexisting backlog, working on other very high priority cases, and that Plaintiff's team was waiting on Mull's unit to complete their portion of the work before Plaintiff could complete those cases. PSF ¶¶ 11, 14. Mull did not do this to other

managers. PSF ¶ 11. Defendant then insisted that Plaintiff respond to all these requests though fully aware of all the factors making it impossible to provide any realistic date for when those cases could be completed. PSF ¶ 16. Mull was allowed to raise these issues in emails to managers though Plaintiff was previously criticized for raising concerns in emails instead of just directly communicating with her peers. PSF ¶15.

Plaintiff overcame the severe limitations of her critical staffing needs and reduced her inherited backlog of 12,000 cases to 871, successfully trained and managed the PITAG staff, supervised and trained the virtual windfall offset team and created a detail of individuals to train others for this project, and participated in a work shop helping other managers. PSF ¶¶ 6, 9, 10, 20. Yet, she still received the worst performance rating in her career and was incredulously accused of "coasting" despite her major accomplishments with a very limited staff. PSF ¶¶ 20-21. She was blamed for some aged cases which only existed because other units had not completed their portion of the work on those cases. PSF ¶ 22. When Plaintiff tried to explain this to Petros, he criticized her for failing to accept constructive criticism. PSF ¶ 22. Kristina Edwards, who was under the age of 40 and Caucasian, received a higher evaluation despite having over 12,000 pending cases despite having more operational support staff than Plaintiff. PSF ¶ 23.

After filing another EEO charge in December 2019, Matthew Smith and Angelo Petros abruptly dumped 1841 older cases from other modules on her in January 2020, and added more cases to her unit in February which increased her previous case load of 871 to approximately 3000. PSF ¶¶ 24-25. Smith admitted it was unusual to assign so many cases at one time to a unit. PSF ¶ 25. Petros gave Plaintiff an Optional Job Discussion in January 2020, for being late to a meeting though he knew she was in the middle of a call with a Congressional aide on a high priority case. PSF ¶ 26.

Younger Caucasian managers who were often late to meetings did not receive an Optional job discussion. PSF ¶¶ 26-27. In February of 2020, after Lenoir asked if her EEO was still pending, he directed Plaintiff to have weekly meetings with Petros and Smith which were always negative and accusatory. PSF ¶ 28.

On January 22, 2021, Plaintiff's EEO appeal to the Office of Federal Operations was denied, and in February 2021, Bernard Mull was assigned to be Operations Support Branch Chief making him Plaintiff's first line supervisor. PSF ¶ 41. Plaintiff requested a transfer so Mull would not be her supervisor due to her prior complaints against Mull. PSF ¶ 41. Sletten agreed to Plaintiff's request, but Rick Lenoir refused claiming that there was no reason why Plaintiff should not report to Mull. PSF ¶ 42.

In *Russell v. Board of Trustees of University of Illinois at Chicago*, the court stated that an "adverse job action is not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well." 243 F.3d 336 (7th Cir. 2001); *Collins v. State of Illinois*, 830 F.2d 692, 703 (7th Cir.1987). In *Collins*, the employee was placed in a new department where her supervisors did not even know what her job entailed. Her office was taken from her, and she was assigned to a desk outside her supervisor's office, where a receptionist would typically sit. These changes constituted an adverse action. *Id.* In *Rodriguez v. Board of Education*, the court found an adverse action occurred when plaintiff was given a lateral transfer to a different work site and directed to teach an entirely different age group. 620 F.2d 362, 364-66 (2d Cir. 1980); *St. John v. Employment Development Department*, 642 F.2d 273, 274 (9th Cir. 1981) (adverse job action found when plaintiff was transferred "to another job of the same pay and status").

These repeated actions against Plaintiff from 2016 through 2020 and into 2021, when viewed

14

cumulatively, are more than sufficient to constitute an adverse action and hostile work environment, even without considering the denial of promotions and developmental assignments. Defendant's attempts to focus on individual incidents does not change this conclusion. Defendant claims that being buried with cases from other modules is not an adverse action because she was not asked to complete those cases by a specific date. But Defendant did criticize her for having a backlog after it transferred a few thousand cases from another manager to her unit, despite knowing that Plaintiff was severely shorthanded and responsible for high priority Congressional inquiries. Defendant cannot dismiss all of the above incidents as Plaintiff's subjective belief given all the evidence she has presented of how she was repeatedly treated from 2017 through 2020 and into 2021, compared to other employees. Contrary to Defendant's claims, Plaintiff has identified comparative employees who were treated more favorably, including Edwards and Mull, and noted that she was the *only* GS 13 manager required to work in a cubicle instead of an office, the only person given useless labor intensive assignments, and the only one receiving a Job Discussion. E.g. PSF ¶¶ 5, 6, 11, 17, 27.

  Defendant cites to *Leitgen v. Franciscan Skemp Healthcare, Inc.* to diminish the significance of the fact that within a month of filing her second EEO charge, 1841 cases from other units were suddenly dumped on Plaintiff which Smith admitted was very unusual, and was issued her first ever On the Job Discussion for being late to a meeting though no other managers received this despite being late, and had her request for a transfer denied as soon as Lenoir confirmed her EEO was still pending. *Leiten* noted that as a general rule, suspicious timing alone, is not enough to prove retaliation. 630 F.3d 668, 675 (7th Cir. 2011). But the court in *Leitgen* noted that the plaintiff had made the same complaints well before he was terminated. *Id.* The court also noted that there were several cases that specifically held that an adverse action occurring within a few days of the protected

15

complaint did support a claim for retaliation. *Spiegla v. Hull,* 371 F.3d 928, 943 (7th Cir.2004) (four days later); *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796–97 (7th Cir.1997) (two or three days later). Moreover, Plaintiff presented evidence as noted above in addition to the suspicious timing, where only she was subjected to some of the adverse actions, and no one else.

### A. Denied Promotion and Opportunities for Advancement

Plaintiff was also repeatedly passed over on promotions, details and LEAD opportunities, in favor of younger Caucasian individuals since 2017. PSF ¶¶ 30-38. Plaintiff had more relevant and broader experience during her 30 plus years with the Agency working in technical positions such as benefits authorizer and claims representative, successfully managed and trained her staff, and received important awards such as a Regional Commissioner Citation and a Commissioner Citation in recognition of her accomplishments. PSF ¶ 30-38. Yet, younger Caucasian or non black employees were repeatedly promoted or selected over her for these assignments, despite her longer tenure and more extensive and broader relevant experience. PSF ¶¶ 30-38. The younger Caucasian individuals benefitted from being repeatedly selected over Plaintiff for details and LEAD opportunities, which Defendant used to fast track their promotions. PSF ¶¶ 30-38. John Bajorek and Matthew Smith received this preferential treatment which led to their promotions to GS 14 positions though Plaintiff had more than twice their years of service. PSF ¶¶ 30, 33-34, 36.

Elisha Hatchett, who is younger than Plaintiff and Caucasian, was assigned as the module manager of Debt Management when Defendant forced Plaintiff to PITAG, and then received a developmental assignment as a GS 14 operations manager for which Plaintiff applied but did not get. PSF ¶ 37. Jana McCann, under 40 and Caucasian, "skyrocketed really quick" to a GS 13 just a few years after she began working for Defendant, and received special tasks for her development

16

while Plaintiff did not get these opportunities. PSF ¶ 38.

Managers such as Margie Sletten also discriminated against other older black managers such as Yvonne Hampton, Steve Harms, Sherman Johnson, C Nachtrag Trinchitella, Allen Tebbens, Rosie Carter, and David Turner. PSF ¶ 39. These managers were asked to train younger Caucasian or non black individuals who then replaced them. PSF ¶¶ 39-40. These younger non black individuals included Isaac Aguilar, hired in 2013 as a GS 7 and is now a GS 13 modular manager; Richard Wharton, hired in 2008, received a developmental assignment, and promoted in October 2017 to a GS-13 Section Chief; and Kristina Edwards who was promoted to a GS-13 Module Manager less than 10 years after being hired. PSF ¶ 40.

### B. Additional Evidence of Discrimination and Retaliation

There are other examples where Plaintiff was treated differently compared to younger Caucasian employees. Her managers refused on eight separate occasions to accept Plaintiff's nomination of an older African American employee for Employee of the Month though Sletten conceded that employees nominated by their managers generally receive those awards. PSF ¶ 43. Matthew Smith often treated Plaintiff in an demeaning manner which was in sharp contrast to how he interacted with Caucasian individuals. PSF ¶ 44. Sletten often praised younger Caucasian managers at meetings, but never praised Plaintiff for her accomplishments. PSF ¶ 46. Rick Lenoir often gave Plaintiff dirty looks and falsely asserted that employees claimed she was adversarial, but then conceded that no one made these complaints. PSF ¶ 47. Smith, Lenoir and Sletten failed to give Plaintiff credit for her work such as eliminating the back log of cases transferred to her from other managers, such as Kristina Edwards, while giving Edwards a higher performance rating than Plaintiff though Edwards had over 12,000 cases pending in September of 2019 despite having

17

significantly more support staff. PSF ¶¶ 23, 45.

It is noteworthy that other older black employees filed discrimination complaints against the same managers who discriminated against Plaintiff. Four employees filed race and/or age discrimination charges against Matthew Smith, there were 7 EEO charges against Antonio Henderson, 3 against Bernard Mull, 5 against Elisa Harchett, 4 against Kristina Edwards, and at least two EEO charges that Sletten could recall against her. PSF ¶¶ 48-50.

### III. EVIDENCE OF PRETEXT

Defendant contends that Plaintiff cannot establish pretext for the non-selection to the LEAD program, her performance evaluation, or the failure to promote her. Plaintiff, however has presented evidence of pretext. Defendant's stated reasons for reassigning Plaintiff from Debt Management to PITAG were due to her alleged failure to train employees at Debt Management and alleged undocumented performance issues. Plaintiff did complete the training for the Debt Management staff in 2015, and there was significant training needed for the new staff in PITAG. Since PTIAG was a highly specialized unit with high priority cases, and was severely understaffed and burdened with a 12,000 case backlog, Defendant would not have transferred her if she was unable to train staff or had any performance problems. PSF ¶¶ 3-4, 6-7.

Defendant's stated reasons for the performance evaluation were also a pretext. Defendant claimed that she was "coasting" as an excuse for the lower performance evaluation, Yet, she had virtually eliminated the 12,000 backlog of cases she inherited despite having only 12 employees, trained her new team members, successfully supervised and trained the virtual windfall offset team, and participated in a work shop helping other managers. PSF ¶¶ 6, 9, 10, 20. When Plaintiff explained to Petros that a subsequent spike in her aged cases was due to other modules failing to

18

complete their portion of the work thereby affecting her ability to close them out, he criticized her inability to accept constructive criticism. PSF ¶¶ 20-22.

Defendant claimed that Plaintiff did not receive these same opportunities because she needed more developmental and collaborative skills, despite her wealth of experience and having excelled as a manager precisely because of her leadership and collaborative skills. PSF ¶¶ 3, 9, 10, 35. She received the highest rating in the performance categories of "Achieves Business results," "Leadership." and "Manages Performance," cleared a backlog of 12,000 cases despite being severely understaffed, yet her managers, Matthew Smith and Petros, only recommended her for these positions "with reservations." PSF ¶¶ 31-32, 35; Ex. I. These are just some examples of pretext.

## CONCLUSION

Wherefore, Plaintiff requests that Defendant's motion for summary judgement be denied.

*Arthur R Ehrlich*
_____
Arthur R. Ehrlich of the Law Offices of GOLDMAN & EHRLICH, CHTD., as attorney for Plaintiff ROCHELLE HAMBRICK

Arthur R. Ehrlich
Law Offices of Goldman & Ehrlich, Chtd.
10 S. LaSalle Street, Suite 1800
Chicago, IL 60603
(312) 332-6733
arthur@goldmanehrlich.com