**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ROCHELLE HAMBRICK,

     Plaintiff,

  v.

KILOLO KIJAKAZI, AS COMMISSIONER OF
THE UNITED STATES SOCIAL SECURITY
COMMISSION,

     Defendant.

No. 21 C 00030

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Rochelle Hambrick ("Hambrick") sued her employer, the United States Social Security Commission (the "SSA"), alleging discrimination and a hostile work environment based on her race and age in violation of Title VII and the ADEA. She also alleges she was retaliated against for complaining about the discrimination. The SSA moved for summary judgment. R. 25. For the following reasons, that motion is granted.

### Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d

887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 2021 WL 4486445, at *1 (7th Cir. Oct. 1, 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Background

### I.     Local Rule 56.1

As an initial matter, the SSA argues that Hambrick has failed to comply with Local Rule 56.1 and Federal Rule of Civil Procedure 56(c). First, the SSA alleges that Hambrick's response to the SSA's Local Rule 56.1 statement does not fully respond to many of the SSA's statements of fact and improperly asserts many additional, non-responsive facts. Local Rule 56.1 provides that in its response, a party "must specify which part of the asserted fact is admitted and which part is disputed," and "may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made." LR 56.1(e)(2). Many of Hambrick's responses deny a portion of the SSA's particular statement of fact and are silent as to the

remainder.[1] Where Hambrick did not respond, the Court will deem the fact admitted. The SSA also alleges that Hambrick included improper additional facts in her responses. The Court disagrees. Though Hambrick's response does, at times, reference additional, somewhat tangential facts, they are at least fairly responsive to the corresponding facts in the SSA's Statement.

Finally, the SSA alleges that many of the facts in Hambrick's Rule 56.1 Statement are not supported by admissible evidence. To the extent the party relies on affidavits or deposition testimony, it must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "[A]lthough personal knowledge may include reasonable inferences, those inferences must be grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (cleaned up).

Citing *Schacht v. Wisconsin Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999), the SSA argues that the Court should disregard the allegations in Hambrick's Local Rule 56.1 statement and response brief that are supported only by citations to Hambrick's testimony because they are self-serving and not supported by other evidence. However, the Seventh Circuit explicitly overruled *Schacht* in *Hill v.*

---

[1] The SSA identifies the following paragraphs in Hambrick's response to its Rule 56.1 Statement which only specify that part of the paragraph is disputed: R. 35 ¶¶ 5, 7, 36, 37, 48, 49, 59, 75, 76. Hambrick failed to respond to ¶ 3 entirely.

*Tangherlini*, 724 F.3d 965, 967–68 (7th Cir. 2013), in which it held it was error to discredit the plaintiff's testimony merely because it was "self-serving." Indeed, "[d]eposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving." *Id*. What matters instead is whether the statement is admissible under the Federal Rules as based on the plaintiff's personal knowledge. *Id*.

Thus, the Court will not immediately disregard Hambrick's facts that are supported only by her own testimony. Instead, it will disregard only the facts that are based on conjecture, as well as facts supported only by inadmissible hearsay. *See, e.g.*, R. 36 ¶¶ 14, 16 (citing Hambrick's testimony to establish what other people thought or knew); ¶¶ 31, 34, 38 (citing Hambrick's testimony in which she says, without a factual basis, that she was more qualified than others); R. 35 ¶ 33 (citing Hambrick's testimony, based on conjecture, that she was the only employee asked to complete a time-consuming spreadsheet that her supervisor did not use); ¶ 73 (citing Hambrick's testimony that she heard from another employee, who overheard a phone conversation, to establish that Hambrick's supervisor reached out regarding her EEO case). All such statements in Hambrick's Local Rule 56.1 Statement or Response to the SSA's Statement are thus excluded. *See, e.g.*, *Trimble v. All.-DeKalb/Rock-Tenn Co.*, 801 F. Supp. 2d 764, 769 (N.D. Ill. 2011). The Court now turns to the undisputed facts giving rise to this case.

## II.    Hambrick's SSA Employment History

Hambrick, a black woman, was born in 1970 and has worked at the SSA's Great Lakes Program Service Center ("Great Lakes") since 1989. R. 27 ¶ 1. She has a college degree and has worked in management for 12 years. R. 36 ¶ 31.

### a. 2016

In January 2016, Margie Sletten, Hambrick's second-line supervisor, told her that she was to be reassigned from managing the debt management unit to the program integrity target and assistance group ("PITAG") because she was not a "good fit" in her prior section. R. 27 ¶¶ 2, 4; R. 35 ¶ 5; R. 36 ¶ 2. Hambrick admits, and it was well known that Hambrick did not get along with her prior first-line supervisor in the debt management unit. R. 27 ¶ 4; R. 35 ¶ 4. PITAG is a specialized unit that handles high-profile and sensitive congressional inquiries and, like the rest of Great Lakes, must process many cases with limited staff. R. 27 ¶¶ 2–3. At the time of Hambrick's reassignment, PITAG had a backlog of 12,000 cases and no assistant manager. R. 36 ¶ 7. Hambrick's grade and pay (GS-13) did not change as a result of the reassignment. R. 27 ¶¶ 2–3. Angelo Petros became her first-line supervisor, and Sletten remained her second-line supervisor, though she was replaced by Rick Lenoir in April 2016. *Id.* ¶¶ 6–7. Antonio Henderson was the deputy operations support branch chief under Petros. *Id.* He was eventually replaced by Matthew Smith.

When Hambrick started her position in PITAG, she worked out of an empty office, but Henderson quickly moved her to a cubicle. *Id.* ¶ 8; R. 36 ¶ 5. She was the only GS-13-level supervisor who did not have her own office, though there were at least seven other GS-13-level non-supervisors who worked out of cubicles. R. 27 ¶ 9;

R. 36 ¶ 5. Hambrick's name was not included on the Great Lakes management directory until about June of 2016. R. 27 ¶ 24. Part of her job duties in PITAG included conducting extensive training of employees. R. 36 ¶ 3. From May to December 2016, Hambrick was also required to supervise a virtual workgroup, which took about four hours a day. R. 27 ¶ 23.

Between May and September 2016, Bernard Mull, a supervisor in one of the other modules, and his supervisees, Candace Irving, Kristina Edwards, and Elisa Hatchett, emailed Hambrick to follow up on various outstanding high-priority manager-to-manager requests. *Id.* ¶¶ 10–19. Three of these emails were directed to or copied Hambrick's supervisees. *Id.* ¶¶ 11, 14, 18. Each time, Hambrick requested that they direct their correspondence to her, and not her supervisees, because reaching out to her supervisees undermined her authority. *Id.* Mull's team escalated their concerns to Henderson, who, along with Irving, asked Hambrick multiple times to provide updates and expected completion dates for the outstanding requests. *Id.* ¶¶ 15, 17–19. Hambrick refused and explained that she was overwhelmed with staffing issues and conducting employee training. *Id.* ¶¶ 15, 17, 19. Hambrick felt these emails were harassing because the senders of the emails worked down the hall from her and could have talked to her in person. R. 36 ¶ 14. Petros told Hambrick during a performance review that she should have responded to the emails with expected completion dates. *Id.* ¶ 20. Hambrick states she could not do this because she had no idea how long it would take to complete the requests due to staffing issues. *Id.* In September 2016, Hambrick reached out to the EEO counselor about filing a

6

discrimination claim. *Id.* ¶ 26. A month later, Hambrick received a request that she log on to a new manager-to-manager application, but she found her log-in information did not work and was unable to do so. *Id.* ¶ 21–22.

### b. 2017 – 2018

In August 2017, Hambrick applied, but was not selected, for a developmental position and promotion through the Leadership Encouraging Advancement through Development ("LEAD") program. *Id.* ¶ 27. There were three eligible candidates for the position, including Hambrick. *Id.* ¶ 28. Lenoir, the selecting official for the program, personally knew and worked with all three candidates. *Id.* Lenoir selected John Bajorek, a younger white employee, for the position. *Id.* ¶ 29. Lenoir stated that he selected Bajorek because Lenoir had observed Bajorek's ability to work collaboratively, Bajorek had stepped into his supervisor's role on multiple occasions when she was unavailable, and his supervisor highly recommended him. *Id.* Lenoir testified that he did not select Hambrick because he believed she needed to work on her collaborative skills and her supervisor, Petros, had recommended her with reservations. *Id.* ¶ 30. Hambrick alleges she also applied for two 120-day details outside Great Lakes and the LEAD program again in 2018 and was not selected. *Id.* ¶ 31. In April 2018, Hambrick's name was not listed on a regional commissioner's citation award to Hambrick's team. *Id.*

### c. 2019

Throughout 2019, Hambrick applied for various positions outside Great Lakes, including district manager, assistant district manager, and a 120-day detail, but was

not selected. *Id.* ¶ 44. In April 2019, Sletten asked Hambrick to create a spreadsheet listing every congressional case that was "aged." *Id.* ¶ 33. This was a very time-consuming task, and Hambrick is unaware of whether the list was used by Sletten or anyone else. *Id.*

In September 2019, Hambrick received an email from Dottie Hall, a senior constituent services associate with a congressperson's office, asking her to review information that had been provided by a PITAG employee in response to a request for beneficiary information. *Id.* ¶ 34. Hall questioned the accuracy of Hambrick's response, and Hambrick replied, "I apologize for not providing you with a response that is palatable," explained that the PITAG employee should not be questioned because he or she was an "authoritative expert," and told Hall her calculations were incorrect. *Id.* ¶ 35. Another SSA supervisor, who was copied on the email chain, forwarded this message to Lenoir, citing concerns about Hambrick's wording and tone. *Id.* ¶ 36. Hall herself also complained to Lenoir about the tone of the email, referring to it as "nice nasty," and requested that Hambrick not be on future calls, though she did state that she respected Hambrick. *Id.* ¶ 37; R. 27-1 at 551. To remedy the situation, Lenoir sent Hall a new worksheet prepared by another analyst and met with Hambrick three times. R. 27 ¶¶ 38–39.

In November 2019, Hambrick received a performance rating of "3," the lowest of her career, which is equivalent to a passing grade. *Id.* ¶ 40. During her performance meeting, Petros told Hambrick that she was "coasting" and needed to be more open to feedback. *Id.* He also did not give her credit for reducing the 12,000-case backlog

in PITAG down to less than 900 and stated she had a few projects which "continued to linger." *Id.*; R. 35 ¶ 48; R. 36 ¶ 10. Hambrick argued that those projects could not be completed because she was waiting for other managers to complete their part of the work, and in response, Petros told her she needed to work on accepting constructive criticism. R. 36 ¶ 22.  Hambrick disagreed with the evaluation, because she stated she worked hard, and her unit was short-staffed. *Id.* ¶ 42.

A week after contacting an EEO counselor in December 2019 about asserting a new discrimination claim, Hambrick was informed that PITAG would be receiving over 1,800 unjust enrichment cases that had been pending in other units and had been identified through a new computer program. *Id.* ¶¶ 45–46. This was an "unusual" occurrence. R. 35 ¶ 46. Petros and Smith met with Hambrick and explained why and how the cases would be coming to her unit. R. 27 ¶ 46. In essence, these cases were normally screened by other modules and sent on a case-by-case basis to PITAG, but management developed a computer system to automate and streamline this process. *Id.* ¶¶ 47–48.  It identified all cases which would have been rerouted to PITAG individually and sent them at once. *Id.*

### d.  2020

In January 2020, Petros gave Hambrick an "optional performance discussion" because he alleged she had been late to or missed nearly every weekly management meeting since October 2019. *Id.* ¶ 49. Hambrick disputes this, instead stating that she missed only one meeting because she was on an important call at the time, and that other managers were late to meetings and did not receive performance

9

discussions. R. 35 ¶ 49. The discussion did not have a negative impact on Hambrick's performance review or developmental opportunities. R. 27 ¶ 49. On February 5, 2020, Hambrick attended a mediation for her EEO case with Lenoir and others. *Id.* ¶ 50. Hambrick asked to be assigned outside Great Lakes. *Id.* Lenoir responded, "Give me five minutes, I'll be back," in a condescending tone. *Id.* He did not grant the request because he did not have authority to assign her to a different office. *Id.*

On February 10 and 11, Petros and Smith required Hambrick to have weekly workload meetings, which were common at Great Lakes, though Hambrick believed the tone of the meetings was accusatory, negative, and harassing. *Id.* ¶ 51; R. 35 ¶ 51. On February 21, Hambrick requested leave because her daughter had been in a car accident. R. 27 ¶ 52. Smith verbally approved the leave but did not officially approve it until a few days later. *Id.* ¶¶ 52–53. Smith requested that Hambrick provide documentation, and at some point, asked if she planned on working overtime the following weekend, which Hambrick believed to be harassment in response to her request for leave. *Id.* ¶ 52; R. 36 ¶ 29. Smith does not recall asking her about overtime and testified that he often asked about employees' availability for overtime as a routine matter. R. 27 ¶ 54.

### e. 2021

In February 2021, Mull was selected to be the acting operations support branch chief. *Id.* ¶ 56. Hambrick requested to be reassigned or transferred to avoid working with Mull, given her prior difficulties with him. *Id.* ¶ 57. Lenoir instead offered her relocation to a different floor of the building with the same job title, but she declined.

10

*Id.*; R. 36 ¶ 42. Mull acted as Hambrick's first-line supervisor for 120 days without issue. R. 27 ¶ 56. Hambrick also unsuccessfully applied for a district manager position and the FIRE development program during 2021. *Id.* ¶ 58.

### f. Other Conduct

Hambrick claims that Petros did not give an employee of the month award to an older, black member of Hambrick's unit whom Hambrick had nominated eight times, even though Sletten stated that the employees who are nominated are usually given the award. *Id.* ¶ 61; R. 35 ¶ 61. Hambrick also alleges Sletten prevented her from receiving promotions, was hard on her, and never celebrated her accomplishments, but would celebrate the accomplishments of younger, white employees. R. 27 ¶¶ 60, 67. Lenoir went out of his way to acknowledge other units' accomplishments but never acknowledged PITAG's and gave her dirty looks, she claims. *Id.* ¶ 62; R. 36 ¶ 47. Hambrick feels Henderson had a rapport with younger employees he did not have with Hambrick. *Id.* ¶¶ 68–71. Hambrick alleges that Smith would tell her to do what she was told, talk down to her, and rarely say positive things to her. R. 36 ¶ 44. Finally, Hambrick alleges that, whenever she unsuccessfully applied for new positions or development programs, in each case, a younger or non-black employee was selected; other than the August 2017 LEAD program, she testified that she did not know who specifically was selected for each position. R. 36 ¶¶ 31–32. She does, however, provide a list of younger, non-black employees she claims rose through the ranks at Great Lakes more quickly than Hambrick did, including Bajorek, Smith, Hatchett, Edwards, McCann, Isaac Aguilar, and Richard

Wharton. *Id.* ¶¶ 34–40. At the time of discovery in this case, Hambrick still worked at the SSA as the manager of PITAG. *See* R. 27-1 at 217 (Q: "Can you tell me what [Hambrick's] current title is . . . ?" A: "She's the PITAG manager.").

### III.  Procedural History

#### a.  First EEO Complaint

Hambrick first contacted the SSA's EEO counselor on September 19, 2016, and on November 11, 2016 submitted a formal EEO complaint asserting discrimination on the basis of age and in retaliation for reaching out to the EEO counselor. *Id.* ¶¶ 25–26. She pointed to her involuntary reassignment to PITAG and alleged that Henderson, Mull, Hatchett, Edwards, and Irving had harassed her over email about outstanding manager-to-manager requests. *Id.* Moreover, her narrative stated, "I also feel in some ways race is involved," and alleged that a white person was promoted despite a lack of experience. *Id.* ¶ 26; R. 35 ¶ 26.

On December 23, 2016, the EEO accepted Hambrick's claims that she was subject to age discrimination and retaliation in October 2016 when her work assignments increased and that she had been subject to a hostile work environment since January 20, 2016. R. 27 ¶ 63. The EEO dismissed her claim relating to her reassignment to PITAG as untimely. *Id.* In May 2018, the EEO granted Hambrick leave to amend her initial EEO complaint to include discrimination based on race due to Bajorek's selection to the LEAD program instead of her in 2017. *Id.* ¶ 64. In July 2019, the EEO issued a final decision in the SSA's favor. *Id.* ¶ 65. The Office of Federal Operations affirmed. *Id.*

12

### b. Second EEO Complaint

On December 4, 2019, Hambrick contacted an EEO counselor about asserting a new discrimination claim. *Id.* ¶ 45. On March 2, 2020, the EEO received Hambrick's second EEO complaint, in which she alleged discrimination because of her age and race and in retaliation for reaching out to the EEO counselor in December 2019. *Id.* ¶ 55; R. 35 ¶ 55. Specifically, she alleged she had been subjected to a hostile work environment from September 2019 to February 2020 based on the 1,800 unjust enrichment cases suddenly assigned to PITAG, time and attendance meeting requirements, emails, the optional performance discussion, and the 3.0 on her 2019 performance review. *Id.* The EEO issued a final decision in the SSA's favor on Hambrick's second EEO charge in November 2020. *Id.* ¶ 65.

## Analysis

The SSA argues that summary judgment is proper because (1) Hambrick has failed to exhaust her administrative remedies as to some of her claims; and (2) the undisputed material facts do not support Hambrick's claims of adverse employment actions or a hostile work environment connected to her race, age, or protected activity. The Court first analyzes whether Hambrick timely exhausted her claims before determining whether any remaining claims may proceed to trial on their merits.

### I. Exhaustion

The SSA argues that summary judgment is proper on Hambrick's claims for discrimination occurring before August 5, 2016 because Hambrick did not timely exhaust them, and on the SSA's failure to promote her in 2018, 2019, and 2021

13

because she failed to raise them in either EEO complaint. "Before a federal civil servant can sue his employer in court for discriminating against him in violation of Title VII, he must first exhaust his administrative remedies." *Green v. Brennan*, 136 S. Ct. 1769, 1775 (2016) (citing 42 U.S.C. § 2000e–16(c)). "To exhaust those remedies, the Equal Employment Opportunity Commission (EEOC) has promulgated regulations that require, among other things, that a federal employee consult with an EEO counselor prior to filing a discrimination lawsuit." *Id.* Specifically, she "must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or . . . within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1). The regulations provide for equitable tolling of the 45-day time limit. 29 C.F.R. § 1614.105(a)(2).

First, the SSA argues that Hambrick's claims regarding disparate treatment occurring before August 5, 2016 (45 days prior to her first contact with the EEO counselor) were not properly exhausted because the EEO dismissed them as untimely. These claims include her reassignment to PITAG, the involuntary move to a cubicle, some of the allegedly harassing emails she received from Mull and his team, the failure to include her in the management directory, and her supervision of the virtual workgroup. In response, Hambrick alleges that these occurrences are not discrete adverse actions, but rather, are part of a continuing hostile work environment such that the Court may consider them cumulatively.

Discrete acts are those "such as termination, failure to promote, denial of transfer, or refusal to hire" that are easy to identify. *Nat'l R.R. Passenger Corp. v.*

14

*Morgan*, 536 U.S. 101, 114 (2002). The plaintiff must file an EEO charge for each discrete act within the appropriate time period. *Id.* On the other hand, a hostile work environment is "different in kind from discrete acts," involving "repeated conduct" occurring "over a series of days or perhaps years" that may, on its own, not be actionable. *Id.* at 115. When a party alleges a hostile work environment, earlier acts outside the limitation period are not time barred, so long as at least one act occurred within the 45-day period. *Id.* at 117–20.

Plaintiff's reassignment to PITAG is one of those easy-to-identify discrete acts for which Plaintiff should have filed an EEO charge within the 45-day time period. Her failure to do so, and her failure to identify any reason for equitable tolling,[2] means that any claim based on that reassignment was not administratively exhausted and is thus time barred. However, the other claims, such as the forced movement to the cubicle, the emails, and the failure to list Hambrick's name in a management directory, are the type of repeated conduct which may cumulatively constitute a hostile work environment. Because some of the emails and conduct occurred within the 45-day window before her first contact with the EEO counselor, Hambrick may make a hostile work environment claim which includes them.[3]

---

[2] Indeed, Hambrick does not dispute that she had filed complaints with the EEOC before 2016 and was familiar with the process and time limits for filing claims. R. 27 ¶ 25.

[3] The Court reads *Morgan* to hold that those discrete acts which are time barred cannot also form the basis for a hostile work environment claim. 536 U.S. at 114–18 (dismissing discrete acts as "no longer actionable" because they were time barred but allowing hostile work environment claim based on other conduct to go forward).

The SSA also argues that Hambrick did not properly exhaust her failure to promote claims for the various positions to which she applied in 2018, 2019 and 2021 because she failed to raise them in either of her EEO proceedings. Hambrick insists that the EEO did investigate the failures to promote in her first EEO case, and that the 2021 failures to promote were in retaliation for Hambrick filing her second complaint and thus fall under an exception to administrative exhaustion.

Each "failure to promote" is a discrete act for which the plaintiff must file a charge within the limitations period. *Morgan*, 536 U.S. at 114. The only failure to promote that the EEO considered in Hambrick's first proceeding was her non-selection for the LEAD program in 2017. It did not, contrary to Hambrick's assertion, consider any general pattern of failures to promote. R. 27-1 at 711–13. In her second EEO complaint, Hambrick mentioned that her requests for reassignments out of Great Lakes were denied and given to younger, Caucasian employees, but provided no specifics regarding the actual positions for which she applied, the dates of denial, who was doing the hiring, or who was ultimately chosen for the positions. R. 27-1 at 680–81. Even if this suffices to raise the failures to promote to the EEO, she did not timely do so within 45 days of the acts. And ultimately, the EEO did not accept these claims for investigation. *Id.* at 649. Thus, any claim that Hambrick was subject to discrimination when she was not selected for promotion in 2018 or 2019 was not properly exhausted.

As to her unsuccessful applications for promotion or transfer in 2021, Hambrick claims they fall under the retaliation exception to exhaustion. This is a

16

"limited exception" where the Court recognizes it would be inefficient to require a plaintiff to file a separate EEO complaint alleging retaliation occurring because of the filing of a first EEO complaint. *Zegarra v. John Crane, Inc.*, 218 F. Supp. 3d 655, 663 (N.D. Ill. 2016). Thus, Hambrick may claim only retaliation as to the SSA's failure to select her for promotion or transfer in 2021.

## II. Merits

The SSA next argues that Hambrick's remaining claims fail on the merits. First, the SSA alleges that most of the conduct at issue does not rise to the level of an adverse employment action and is also not severe or pervasive enough to make out a hostile work environment claim. And, according to the SSA, even if the conduct does qualify as actionable discrimination or harassment, the undisputed facts do not show a causal connection to Hambrick's race, age, or protected activity. The Court agrees.

### a. Adverse Employment Actions

First, the majority of the conduct in this case does not rise to the level of an actionable adverse employment action. To survive summary judgment, the adverse employment actions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities," *McKenzie v. Milwaukee Cnty.*, 381 F.3d 619, 625 (7th Cir. 2004) (citations omitted), and "generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce further career prospects; and (3) unbearable changes in job conditions." *Barton v. Zimmer*, 662 F.3d 448, 453–54 (7th Cir. 2011). In the

17

retaliation context, protection extends to actions that would dissuade a "reasonable employee . . . from engaging in the protected activity." *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 461 (7th Cir. 2007). Only that retaliation which "produces an injury or harm" constitutes an actionable adverse employment action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006); *see also Lewis v. Wilkie*, 909 F.3d 858, 867–68 (7th Cir. 2018) ("[P]etty slights or minor annoyances that often take place at work" do not suffice).

Here, Hambrick claims in her response that she suffered adverse employment actions when the record is reviewed cumulatively, but she fails to specify what actions she believes qualify. However, "caselaw limits" the "'totality of the circumstances' . . . approach to . . . hostile work environment claims," not adverse employment action claims. *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016). As to the majority of the properly-exhausted conduct in this case, Hambrick cannot make out claims for adverse employment actions.

Hambrick's allegations that she suffered from a heavy workload and difficult assignments are not discrimination. More specifically, she alleges that, when she was assigned to PITAG, she had to deal with a backlog of 12,000 cases, employee training, and supervision of a workgroup. She also claims that Sletten requested that Hambrick create an aged cases spreadsheet, and that she was assigned 1,800 unjust enrichment cases (which would have been assigned to PITAG anyway) all at once after she had contacted the EEO counselor. However, it is well established that harder work assignments cannot amount to an adverse employment action. *Fane v.*

18

*Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007); *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003); *see also McKenzie*, 381 F.3d at 625 (an adverse employment action is "more disruptive than . . . an alteration of job responsibilities.").

The claims which can fairly be summarized as personality conflicts, like the allegedly "harassing" emails from Henderson and Mull's team which followed up on their requests for an expected timeline and copied PITAG employees, the belief that Hambrick's tone in an email directed to a congressional staffer was inappropriate, workload meetings which Hambrick felt were "negative," and Hambrick's perception that her supervisors did not recognize her accomplishments, talked down to her, gave her dirty looks, or had a better rapport with others, are similarly not adverse employment actions. *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1107 (7th Cir. 2012) ("personality conflicts" are not actionable); *White*, 548 U.S. at 68 ("snubbing by supervisors and co-workers are not actionable under Title VII") (quotation omitted).

Hambrick's claims also involve petty slights and administrative errors, including the assignment of Hambrick to a cubicle, the delay in putting her name in the manager directory, the omission of Hambrick's name from an award to her team, her inability to log on to a manager application, the delayed approval of her leave along with a request that she substantiate her leave and work overtime, and the non-selection of an employee she nominated for employee of the month. These are also not adverse actions. *See Lewis*, 909 F.3d at 868 (petty slights and administrative errors are not adverse actions); *Longstreet v. Ill. Dep't of Corrections*, 276 F.3d 379, 384 (7th

Cir. 2002) (holding that verbal reprimands and "being required to substantiate that . . . absences from work were illness-related" were not adverse employment actions under Title VII).

The SSA thus argues that the only materially adverse actions in this case are: (1) the selection of Bajorek instead of Hambrick for the LEAD program in 2017; (2) Hambrick's lower performance rating of "3" in 2019; and (3) the allegedly retaliatory failure to transfer or select Hambrick for other positions in 2021.[4] The non-selection of Hambrick for the LEAD program constitutes an adverse employment action because the SSA admits that it was a GS-14 level position, which would have increased Hambrick's pay and promotional opportunities. R. 27 ¶ 28. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 899 – 900 (7th Cir. 2003) (failure to promote to position which had slightly higher pay constituted adverse employment action). Hambrick's claims that she was not selected for the FIRE development program or district manager position in 2021 also qualify for the same reason. However, as to her request for a relocation or transfer to avoid working with Mull in 2021, Hambrick has failed to show that an available position even existed. *See Han v. Whole Foods Market Group, Inc.*, 44 F. Supp. 3d 769, (N.D. Ill. 2014) (employee could not allege adverse employment action based on failure to promote where she could not show that there

---

[4] Hambrick cites to *Collins v. State of Ill.*, 830 F.2d 692, 703 (7th Cir. 1987), in which the court found an adverse action occurred when the plaintiff was transferred to a new department, her office was taken from her, and she was assigned to sit where a receptionist would normally sit. Hambrick's transfer to PITAG may arguably fit this fact pattern, but as discussed above, it was not properly exhausted.

were open positions available). Even so, the "mere denial of a lateral transfer" does not constitute an adverse employment action. *Johnson*, 325 F.3d at 900.

Hambrick can also make out a claim on the 2019 lowered performance evaluation. Verbal reprimands and negative performance evaluations which do not result in harm generally do not amount to adverse employment actions. *Lewis*, 909 F.3d at 868; *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 739 (7th Cir. 2006). But, where it leads to "ineligibility for job benefits like promotion," a reprimand can conceivably be actionable under Title VII. *Oest v. Ill. Dep't of Corrections*, 240 F.3d 605, 613 (7th Cir. 2001). Here, Hambrick stated that she did not receive an unspecified monetary award and was not considered a "viable candidate" for promotion due to her 2019 performance evaluation. R. 27-1 at 516. Drawing all reasonable inferences in the light most favorable to Hambrick at this juncture, it is certainly plausible that a lower performance evaluation caused Hambrick to fall out of consideration for promotion. And, indeed, Hambrick did unsuccessfully apply for several promotions in 2019. On the other hand, the other claims in this case relating to minor verbal reprimands, like the admonishment for Hambrick's refusal to provide expected completion dates for manager-to-manager requests, meetings regarding Hambrick's "nice nasty" email to the congressional staffer, and the optional performance discussion regarding Hambrick being late to or missing meetings do not qualify as adverse employment actions. Thus, the SSA is correct that the only actionable adverse action claims in this case are the SSA's failure to promote

Hambrick to the 2017 LEAD program, her lowered 2019 performance evaluation, and the non-selections to the FIRE program and the district manager positions in 2021.

### b. Hostile Work Environment

Finally, Hambrick alleges that the record in this case, considered cumulatively, supports an actionable hostile work environment. Title VII and the ADEA protect against a hostile work environment so "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Boss*, 816 F.3d at 920 (citation omitted). To show that hostile conditions existed, Hambrick must produce evidence that the work environment was objectively and subjectively offensive and show that the alleged harassment was severe or pervasive. *Id.* Whether the conduct rises to the level of an objectively hostile work environment depends on "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 714 (7th Cir. 2017) (citation omitted).

The totality of the undisputed facts here, summarized above, consisted of unremarkable workplace disagreements and Hambrick's dissatisfaction with her supervisors, heavy workload, and lack of recognition. *Boss*, 816 F.3d at 920 ("a mishmash of complaints about overwork" did not establish hostile work environment); *Abrego v. Wilkie*, 907 F.3d 1004, 1015-16 (7th Cir. 2018) (complaints that supervisors were short-tempered, unfairly critical, disrespectful, and engaged in

22

"excessive monitoring" did not establish hostile work environment); *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004) (complaints about "transfers, a late overtime payment, salary, and difficulties with managers" was "normal workplace friction"). Further, the conduct at issue was neither severe nor pervasive. Rather, these petty slights and personality conflicts occurred sporadically over the course of five years. The Court thus grants summary judgment as to Hambrick's hostile work environment claim. The Court next examines each of the three remaining claims (the failure to promote to the 2017 LEAD program, the 2019 performance evaluation, and the non-selections to the FIRE program and the district manager positions in 2021) in turn.

### c. Causation

For the remaining claims, the "central question at issue is whether the employer acted on account of the plaintiff's race (or sex, disability, age, etc.)." *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013). "Employers are also prohibited under Title VII from retaliating against an employee who 'filed a complaint or participated in an investigation of an unlawful employment practice.'" *Robertson v. Dep't. of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020) (citing 42 U.S.C. § 2000e-3(a)). On summary judgment "the correct standard . . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the . . . adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Causation is a requirement for both civil rights statutes at issue in this case. *See Skiba v. Ill. Cen. R.R. Co.*, 884

F.3d 708, 719 (7th Cir. 2018); *Monroe v. Ind. Dep't of Trans.*, 871 F.3d 495, 503 (7th Cir. 2017).

One way in which a plaintiff can proceed is through the now-familiar *McDonnell Douglas* burden-shifting framework, under which she first must establish a prima facie case of discrimination. *See Volling v. Kurtz Paramed. Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (*McDonnell Douglas* is a "common, but not exclusive" method to establish a "triable issue of intentional discrimination"). To demonstrate a prima facie case of discrimination or retaliation under *McDonnell Douglas*, a plaintiff generally must show: (1) that she is a member of a protected class or engaged in protected activity; (2) that she was performing her job satisfactorily; (3) that she suffered an adverse employment action; and (4) that similarly situated individuals who were outside her protected class or did not engage in protected activity were treated more favorably. *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). Once established, the employer then presents evidence of a non-discriminatory reason for its decision, and the burden ultimately shifts back to the plaintiff to establish that the employer's reason is pretextual. *Id.*

But ultimately, and regardless of the method of proof used, all evidence is placed "in a single pile," and the question is "whether the evidence would permit a reasonable factfinder to conclude that [the plaintiff's] [protected class or activity] caused" the adverse action. *Ortiz*, 834 F.3d at 765-66. As to each of Hambrick's remaining claims, the Court finds that the answer is no.

### 1. 2017 Failure to Promote to the LEAD Program

24

With respect to her non-selection for the LEAD program in 2017, Hambrick has satisfied the first three elements of a prima facie case of discrimination—she is part of a protected class, has shown that she performed her job satisfactorily, and suffered an adverse employment action. To satisfy the fourth element, Hambrick identifies Bajorek, a younger, white employee, who was selected for the 2017 LEAD position instead of her. Hambrick also points to the promotion of other employees to other positions as comparators. Specifically, she claims that Isaac Aguilar, Richard Wharton, Kristina Edwards, Matthew Smith, Bernard Mull, Elisha Hatchett, and Jana McCann were promoted within the SSA to the GS-13 and GS-14 pay levels more quickly than Hambrick, even though Hambrick believes she had more experience. She also claims that older black managers in general were asked to train younger Caucasian or non-black individuals who then replaced them.

But more evidence should have been offered to satisfy Hambrick's burden of establishing these other employees were similarly-situated. While not a "magic formula," in "the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (cleaned up). Other than Bajorek, Hambrick has not established that any of the employees she identified applied for the same positions as Hambrick, dealt with the same supervisors, were subject to the same standards, or were engaged in sufficiently similar conduct as Hambrick. She

merely states that they rose through the ranks of the SSA more quickly with less experience. There is simply not enough evidence to support Hambrick's allegation that any of these employees, other than Bajorek, were similarly situated. *See Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 897 (7th Cir. 2018) (affirming grant of summary judgment on failure to promote claim because plaintiff "offer[ed] no evidence of [the comparator employees'] background, qualifications, resume, or any other information that would satisfy the plaintiff's burden to demonstrate that the comparators were similarly-situated applicants.").

Under *McDonnell Douglas*, the SSA next presents evidence of non-discriminatory reasons for its selection of Bajorek to the LEAD program. To survive summary judgment, Hambrick must then demonstrate that the SSA's stated reasons are a pretext for discrimination. In order to establish a material issue of fact as to pretext, Hambrick must show that "1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or 2) that an employer's explanation is not credible." *Sublett*, 463 F.3d at 737. Lenoir testified that his selection of Bajorek was based on: Bajorek's demonstrated ability to work collaboratively, his ability to handle work at the GS-14 level because he stood in for his supervisor on a number of occasions, the recommendation of Bajorek's supervisor, and Lenoir's personal observations of Bajorek's work. He also testified that he decided not to select Hambrick for the program because he felt she needed to work on her ability to collaborate with others and because her supervisors recommended her with reservations. Hambrick alleges that Lenoir's stated reasons for Bajorek's selection

26

were a pretext for discrimination because she believes she had significantly more experience and education than Bajorek did. She claims that she had no problems with collaboration because her leadership abilities were rated highly in her performance evaluations and her PITAG team cleared a backlog of 12,000 cases despite being understaffed.

This, however, is not enough for Hambrick to carry her burden of establishing a material issue of fact as to pretext. She has not identified "such weaknesses, implausibilities, inconsistencies, or contradictions . . . that a reasonable person could find [Lenoir's reasons] unworthy of credence." *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) (cleaned up). Lenoir did not state that the LEAD program was seeking the person with the most years of experience, education, or efficiency. Rather, Lenoir testified that he selected the candidate with the best recommendations and leadership skills. Hambrick's experience and qualifications "only would serve as evidence of pretext if the differences between her and [Bajorek] were so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Riley v. Elkhart Comm. Schools*, 829 F.3de 886, 898 (7th Cir. 2016) (quoting *Hobbs v. City of Chicago*, 573 F.3d 454, 462 (7th Cir. 2009)) (cleaned up). Hambrick here has not shown she was clearly better qualified. Though Hambrick alleges she had more years of experience, Bajorek had more GS-14-level leadership experience because he successfully stepped into his supervisor's position when she was out. *Id.* ("[S]eniority is not enough to meet her burden for pretext.") (cleaned up).

Hambrick has not offered any other evidence that, if believed by a reasonable juror, would demonstrate that Lenoir's proffered justifications for picking Bajorek over her were pretextual. *Sublett*, 463 F.3d at 737. Hambrick points to the fact that her team cleared a backlog of cases and that her leadership abilities were highly rated, but this is not such a contradiction that would create a material issue of fact that Lenoir honestly believed Hambrick had issues with *collaboration.* Indeed, it is undisputed that Hambrick had an ongoing history of personality conflicts with many of her peers and every single one of her supervisors.

The fact that Hambrick's supervisors recommended her with reservations provides another legitimate, nondiscriminatory reason for Lenoir's failure to promote Hambrick. Hambrick's subjective belief that her supervisor's recommendation was "bogus" cannot establish pretext. *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 580 (7th Cir. 2015) (plaintiff's "subjective belief . . . does not undermine the honesty of [her employer's] stated explanation for terminating her and thus could not support a finding of pretext."). Simply put, a court is not a "super personnel department that second-guesses employers' business judgments." *Riley*, 829 F.3d at 898. Without meeting her burden to establish pretext, or any direct evidence of discrimination, no reasonable juror could find the SSA's explanation of this decision pretextual, and so Hambrick cannot survive summary judgment on the SSA's selection of Bajorek over her for the LEAD program.

### 2. Lowered Performance Evaluation

As to Hambrick's claim that she received a low performance evaluation in November 2019, she states that Edwards, a younger white manager, received a higher evaluation despite having over 12,000 pending cases and more operational support staff than Hambrick. But the Court will not consider this factual assertion because it is based not on Hambrick's personal knowledge, but on speculation. *See* R. 36 ¶ 23; Pl. Dep. R. 27-1 at 297 (Q: "How do you know what ratings the other managers in your component received?" A: "I can't say that I know, but . . . they're constantly thanked publicly which gives the appearance that they . . . have the blessings, let's say, of [the supervisors]." . . . Q: "Have the other managers in your component ever told you what their ratings are?" . . . A: "No."). Additionally, Edwards worked in a different unit within Great Lakes. There is no indication that Edwards was subject to the same standards as Hambrick in her evaluation. Thus, Hambrick cannot make out a prima facie case of discrimination. The only other evidence of causation that Hambrick points to is the temporal proximity of the evaluation with her appeal of her first EEO complaint. But "the general rule [is] that suspicious timing alone is insufficient to support a claim of retaliation." *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011). Cases in which courts found timing alone to be sufficient involved retaliation that occurred within *days* of the protected activity. *See Spiegla v. Hull,* 371 F.3d 928, 943 (7th Cir. 2004) (four days later); *McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 796–97 (7th Cir. 1997) (two or three days later). Here, Hambrick filed her appeal of her first EEO case in July or August 2019, three months prior to her November performance review, and

Hambrick does not allege or show that her supervisors even knew that she had appealed the EEO's decision. *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918–19 (7th Cir. 2000) (three-month gap between protected conduct and termination alone could not establish causality); *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998) (affirming summary judgment where the employee complained of harassment in August and was laid off in November of the same year). Summary judgment is thus proper on the 2019 performance evaluation claim.

### 3.  Retaliatory Failures to Promote in 2021

Finally, with respect to the alleged retaliatory failures to promote her in 2021, Hambrick first cites again to the possible temporal proximity of her supervisors' refusal to reassign or promote her and some of her protected conduct. Here, the failures to promote came over a year after she filed her March 2020 EEO Complaint, which is certainly not enough of a temporal connection to overcome the general rule that suspicious timing alone cannot support a claim of retaliation. *Leitgen*, 630 F.3d at 675.

Nonetheless, Hambrick implies there must have been retaliation only because she was not selected for the positions. She does not point to any other evidence of causation. Hambrick's subjective belief that the failures to promote were caused by her protected conduct, without a scintilla of factual support, does not create a triable issue of fact. This claim, too, cannot survive.

In sum, most of the occurrences in this case do not constitute adverse employment actions individually or a hostile work environment cumulatively. And,

of the three properly exhausted adverse actions, Hambrick has failed to provide evidence which would permit a reasonable juror to conclude that her race, age, or protected activity caused them. *Ortiz*, 834 F.3d at 765-66.

### Conclusion

For the reasons set forth above, the SSA's motion for summary judgment is granted in full.

ENTERED:

_____

Honorable Thomas M. Durkin

United States District Judge

Dated: November 18, 2022